```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
BARAK STIFTUNG,                :
                 Plaintiff,    :    MEMORANDUM & ORDER
                               :
          -against-            :    05 Civ. 10157 (RMB)MHD)
                               :
CHARLES TOEPFER and SES        :
EQUITIES, INC.,                :
                               :
                 Defendants.   :
------------------------------x
```

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

Plaintiff Barak Stiftung commenced this action to challenge defendants' disposition of certain assets that plaintiff contends it owns, namely a pipeline system and its related facilities. The parties are currently disputing the defendants' assertion of the attorney-client privilege at two depositions.

A. Background

Barak is an entity that was originally owned by Randolph Lenz, the chairman of the Connecticut Bank of Commerce. (Daley Dep. at 8-9, 13, Aug. 16, 2006).[1] The Bank was closed and placed in receivership by the Federal Deposit Insurance Corporation ("FDIC")

---

[1] The citation is to the deposition of Stacie Daley, Mr. Lenz's daughter.

1

in June 2002 (Gallagher Dep. at 47-48, Aug. 16, 2006),[2] and Mr. Lenz was incarcerated sometime thereafter. (Daley Dep. at 17-19). Barak is now owned by Mr. Lenz's daughter and son. (Id. at 13, 19). In this lawsuit plaintiff claims that the pipeline system and the stock of Joarcam Pipeline Company Ltd., although owned by defendant SES Equities LLP ("SES") for approximately ten months in 1997 and 1998, were sold in 1998 to an entity known as Joarcam LLC. Thereafter, the complaint alleges, the owner of Joarcam LLC[3] -- an individual named Lawrence Benenson -- agreed in 1999 to transfer his interest to a designee of the Bank. (Compl. at ¶¶ 7-11). Plaintiff further alleges that it received title to Joarcam LLC by a series of documented transfers culminating in January 2002 -- that is, some months before the closure of the Bank in June 2002. (Id. at ¶¶ 11-15; Gallagher Dep. at 47-48). Plaintiff complains that defendants, falsely purporting to own a controlling share of Joarcam LLC as of 2000, sold the pipeline system in 2005 to another entity. (Id. at ¶¶ 18-22).

---

[2] The citation is to the deposition of Thomas S. Gallagher, Esq.

[3] Or, at least, the owner of 99.75% of the interests in Joarcam LLC. (Compl. ¶ 10).

2

Defendant Charles Toepfer is the principal of his co-defendant, SES. (Toepfer Dep. at 8-9, Apr. 5, 2006).[4] Commencing at some time in the 1990s, Mr. Toepfer apparently engaged in business dealings that involved the Bank, during which he dealt extensively with Thomas S. Gallagher, Esq., an attorney who performed legal services for the Bank until the FDIC took it into receivership. (E.g., Toepfer Dep. at 36, 43-44, 67-69, 77-81, 95-97, 103-05; Gallagher Dep. at 26, 29-31). According to defendants, at various times after the 2002 FDIC takeover of the Bank, Gallagher performed services directly for Toepfer and SES in his capacity as a lawyer. (Sept. 7, 2006 letter to the Court from Peter W. Till, Esq. ("Defs.' Mem.") at 4-5). It is based on this post-2002 relationship that defendants have invoked the privilege to block questioning of Mr. Toepfer and Mr. Gallagher about communications between them and about the services performed by Gallagher for defendants. (Id.).

Plaintiff is moving to compel further testimony and the production of invoices sent by Gallagher to Toepfer. Plaintiff contends that there was no attorney-client relationship between defendants and Gallagher. (Pl.'s Mot. to Compel at 5-7; Pl.'s Reply Mem. at 3-4). It also asserts that in any event defendants have waived any such privilege because Mr. Toepfer testified at his

---

[4] Mr. Toepfer was deposed twice, on April 5 and August 16, 2006. We cite the first transcript as "(Toepfer Dep. at __) and the second as "(Toepfer Dep.2 at __).

3

deposition about communications with Gallagher during the period when he was purportedly receiving legal services from the attorney. (Pl.'s Mot. at 7-14; Pl.'s Reply Mem. at 4-5).

B. Analysis

The party asserting a claim of privilege bears the burden of establishing all elements of the privilege, and he must do so by competent evidence and not with ipse dixit or conclusory assertions. See, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); von Bulow v. von Bulow, 811 F.2d 136, 144, 146 (2d Cir. 1987). As for the elements of the privilege, the parties do not address the choice-of-law question on the current motion, but we infer that under Fed. R. Evid. 501 New York law controls in this diversity case, if for no other reason because the complaint alleges that defendant SES is a New York corporation. See, e.g., Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993)(citing cases); see also Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 521 (S.D.N.Y. 1992).

Under New York law, the privilege is statutorily defined as protecting "confidential communications made between the attorney . . . and the client in the course of professional employment . . . ." N.Y. C.P.L.R. § 4503. "To sustain a claim of privilege, the

party invoking it must demonstrate that the information at issue was a communication between client and counsel . . . , that it was intended to be and was in fact kept confidential, and that it was made in order to assist in obtaining or providing legal advice or [legal] services to the client." Bowne, 150 F.R.D. at 470-71 (citing inter alia People v. Mitchell, 58 N.Y.2d 368, 373, 461 N.Y.S.2d 267, 269-70 (1983)). See also In re Grand Jury Proceedings, 2001 WL 1167497, at *7 (S.D.N.Y. Oct. 3, 2001)("[T]he mere relationship between an attorney and a client does not imply confidentiality."). The privilege does not encompass communications concerning non-legal services provided by the attorney, notably business or other functions that a non-lawyer can perform. See, e.g., Rossi v. Blue Cross & Blue Shield of Greater New York, 73 N.Y.2d 588, 592-93, 542 N.Y.S.2d 508, 509-10 (1989). Moreover, the privilege is deemed waived if the communication or its substance is disclosed to someone not included in the attorney-client relationship. See, e.g., People v. Osorio, 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614 (1980). Finally, under New York law the privilege is only a qualified one, and is thus subject to being overcome by a sufficiently compelling showing of need. See, e.g., Priest v. Hennessy, 51 N.Y.2d 62, 69, 431 N.Y.S.2d 511, 514 (1980).

In seeking to invoke the attorney-client privilege, defendants assert in very vague terms that until the FDIC takeover of the Bank

5

in 2002, Gallagher did not have an attorney-client relationship with defendants, that at some point in 2003 Toepfer did enter into such a relationship with Gallagher, and that consequently any communications between them from that point on are protected by the attorney-client privilege. (See Defs.' Mem. at 4-5). Defendants further argue that they have not waived the privilege by virtue of the disclosure of some of their communications with Gallagher, since those communications all predated the creation of the attorney-client relationship. (Id.).

The pertinent evidentiary record consists solely of the deposition testimony of Toepfer and Gallagher. That testimony does not adequately support defendants' assertions.

As to the period predating the closure of the Bank, Toepfer testified that he had dealt with Gallagher during his business transactions involving the Bank, and that he viewed Gallagher as having acted as his attorney in these transactions throughout the time period beginning in about 1996. (Toepfer Dep.2 at 22-28). Regardless of whether this characterization by a layman has any basis, the record reflects that while Gallagher was working for the Bank, Bank officials instructed him to prepare transactional documents for defendants, thus in effect performing functions that an attorney would normally do for a client. (Gallagher Dep. at 20-

6

22, 29-31). Nonetheless, Gallagher viewed himself as serving as counsel for the Bank and not for Toepfer during this time period (id. at 20-22, 25-26, 28-29, 44-45, 47-48), and that view is plainly correct. His fiduciary obligations were owed to the Bank, which was paying him (Toepfer Dep.2 at 27; Gallagher Dep. at 28), and the tasks he performed that benefitted Toepfer were done at the Bank's instruction and apparently for the purpose of safeguarding the Bank's beneficial interest in Joarcam or the pipeline.

In the period postdating the FDIC takeover of the Bank, Toepfer testified, he occasionally called upon Gallagher for assistance. The precise form of this assistance is not altogether clear, but Toepfer described it as involving principally the review of legal documents, and provision of information -- based on Gallagher's past experience -- as to what defendants should expect from the FDIC in the wake of its takeover of the Bank. (Toepfer Dep. at 72-75; Toepfer Dep.2 at 29-30). Toepfer initially denied that he had retained Gallagher to represent him, and he referred to Gallagher's role as providing "consulting" services for which he was paid. (Toepfer Dep. at 74-75, 127-32). Indeed, at one point, when asked if the work done by Gallagher for him involved "legal services" or "consulting services", Toepfer described it as

consulting services. (<u>Id.</u> at 131).[5]

From the testimony of Toepfer and that of Gallagher, it appears that some of their communications after the FDIC takeover of the Bank concerned defendants' 2004 dealings with the FDIC related to some form of settlement regarding the affairs of the Bank and defendants' obligations to the Bank. (Toepfer Dep.2 at 29; Gallagher Dep. 77-81). Significantly, Gallagher (or more accurately his attorney) represented at his deposition that Gallagher did not view himself as having had an attorney-client relationship with Toepfer in connection with the FDIC settlement (Gallagher Dep. at 80-81), and indeed Toepfer himself identified two other attorneys -- named Braun and McGrath -- as having handled his dealings with the FDIC. (Toepfer Dep.2 at 33). Moreover, it appears that a significant aspect of whatever work Gallagher did in this connection was embodied in a memorandum dated September 28, 2004, which was produced in discovery in this case, thus concededly waiving the privilege. (<u>See</u> Gallagher Dep. at 73-78).

---

[5] Toepfer subsequently testified that he viewed his relationship with Gallagher as one of an attorney and a client despite the absence of a retainer, but he offered no specifics to support this assertion (Toepfer Dep. at 131-32), and his attorney blocked Gallagher from describing the nature of the services provided. (Gallagher Dep. at 53-56). Moreover, Toepfer reported that in the 2004-05 period he and SES were represented by attorneys other than Gallagher. (Toepfer Dep. at 104-05; Toepfer Dep.2 at 6, 33).

8

Toepfer also alluded in general terms to having consulted with Gallagher about defendants' sale, apparently in 2005, of its interest in Joarcam and the pipeline to an entity named Plains All-American. (Toepfer Dep. 127-130; Gallagher Dep. 85-86). It appears that Gallagher may have done some work on that transaction, although whether he was working exclusively for Toepfer is not at all clear. (Gallagher Dep. at 80, 85-86).[6]

Finally, both Toepfer and Gallagher confirmed at their respective depositions that they had spoken about this lawsuit some time after its filing, apparently at Toepfer's initiative. Oddly, although Toepfer described the substance of the conversation, defendants' attorney later invoked the privilege when Gallagher was asked about the same conversation. (Toepfer Dep. at 97-98; Gallagher Dep. at 91).

With this record in mind, we briefly address the privilege issue. Defendants have failed in a number of respects to carry their burden to demonstrate the applicability of the privilege. First, although their counsel asserts in conclusory fashion that Gallagher functioned as counsel to defendants after 2002 -- the

---

[6] At some point in both depositions the deponents confirmed that Gallagher had been paid some amount of money for these services, although they appeared to differ as to the amount and Gallagher referred only to reimbursement for expenses. (Toepfer Dep. at 130; Toepfer Dep.2 at 10-12; Gallagher Dep. at 20, 80).

precise date is unidentified in the record but defendants suggest that it began in 2003 (Defs.' Mem. at 4) -- Gallagher represented that he did not view himself as having served as an attorney for defendants in providing whatever services he performed with respect to the FDIC in 2004. This assertion is in fact consistent with the testimony of Toepfer when he characterized Gallagher's work as involving consulting rather than legal services. Moreover, although the record contains some references to what services Gallagher performed for defendants, those descriptions are extremely vague and equally compatible with Gallagher having performed non-legal and legal functions. Moreover, the absence of detail on this point is attributable to defendants' attorney having blocked Gallagher from testifying about the nature of the services that he had performed. (Gallagher Dep. at 53-56).

Second, the record is entirely silent as to whether the communications between Toepfer and Gallagher were made and held in confidence. This omission is equally fatal to defendants' privilege claim. If anything, the record suggests a lack of confidentiality. Indeed, Toepfer freely produced in discovery some correspondence with Gallagher from September 2004 that defendants' attorney conceded at Gallagher's deposition had waived the privilege at least with respect to those documents. (Gallagher Dep. at 75). Moreover, although neither side has offered us any of the

documentation produced by defendants, descriptions of it in the course of the depositions suggest that Gallagher's communications to Toepfer were disclosed to other participants in defendants' corporate transactions. (See Gallagher Dep. at 78-79).

Third, as noted, Toepfer testified about, or produced copies of, a number of communications between him and Gallagher during the time period when his counsel claims that defendants were represented by the lawyer (e.g., Toepfer Dep. at 97-98), and there is no explanation in the record as to why those disclosures do not constitute a waiver of the privilege, at least with respect to the subject matter of those particular communications. See In re Omnicom Group, Inc. Securities Litigation, 233 F.R.D. 400, 413 (S.D.N.Y. 2006)("[I]f a litigant discloses an otherwise privileged communication, he may be deemed to have waived the privilege with respect to other communications on the same topic."). See generally United States v. Jacobs, 117 F.3d 82, 89-90 (2d Cir. 1997)(discussing waiver extensively). In short, such a waiver may be inferred.

C. Conclusion

In view of the foregoing circumstances reflected in the record, defendants have not carried their burden to demonstrate the

applicability of the privilege to any communications between Gallagher and Toepfer. Accordingly, plaintiff's motion to compel further testimony is granted.

Finally, plaintiffs seek production of invoices sent by Gallagher to Toepfer. Defendants do not address this issue in their motion papers and may therefore be viewed as having conceded this point. In any event, such invoices are ordinarily not privileged since fee arrangements and the general nature of the work performed by an attorney are not protected by the privilege.[7] It follows that defendants must produce these documents.

Dated: New York, New York
       October 16, 2006

                                        MICHAEL H. DOLINGER
                                      UNITED STATES MAGISTRATE JUDGE

---

[7] Indeed, the nature of the attorney's services is crucial to determining whether an attorney is performing a function not covered by the privilege.

12

Copies of the foregoing Memorandum and Order have been mailed today to:

Eric Lee, Esq.
Lee & Amtzis P.L.
5550 Glades Road
Suite 401
Boca Raton, Florida 33431

Peter W. Till, Esq.
105 Morris Avenue
Suite 201
Springfield, New Jersey 07081